## CHAPMAN v. CITY COUNCIL OF CHARLESTON.

1. Choses in action are not personal property within the meaning of the act of 1824 (*Gen. Stat.*, § 1976), and, therefore, may be sold by the executors unless their sale is forbidden by the terms of the will; and where executors have the power to sell, a sale may be made by any one or more of them. City stock is a chose in action.

2. A testator gave to his executors "power to sell and dispose of such parts [of the estate] as they may think expedient, except such public securities as I have directed should constitute the sum of $25,000 for each of my said daughters." He gave to each of his three daughters $25,000, to be "taken in the most secure investments I have, such as stocks or bonds of the city of Charleston or stocks of the State of South Carolina," to be held by trustees for them. He further provided, that his whole estate should be kept together until his youngest daughter married or attained the age of 21, and then divided, the sum of $25,000 in public securities to be transferred to trustees for each of his daughters, and upon the death of any daughter without issue, her share was to determine and pass to his other children. At the date of his will and at his death, testator owned only $73,710 in public securities. One daughter died before testator, and two shortly afterwards—the young-

---

est under age, and all unmarried and without issue. After that, the executors sold $20,000 of Charleston city stock, standing in testator's name. *Held*, that the legacies to the daughters were neither specific nor demonstrative, and that in the events which had happened, the executors were not forbidden by the will to sell, but were expressly authorized so to do.

3. Under proceedings in court, to which the city council was not a party, this $20,000 in city stock was allotted to the widow of testator, but it was never transferred to her on the books of the corporation, and afterwards, while still standing in the name of the estate, was sold by the executors and transferred by the city on its books to the purchasers. *Held*, that the city, having no knowledge of this proceeding, was not bound thereby nor liable to the heirs of testator after the termination of his widow's life estate.

4. The executors were not discharged by these proceedings, as the order of discharge was upon conditions which were never complied with, and as the court had no authority to discharge them.

Before Norton, J., Charleston, July, 1888.

This was an action by the children of Thomas E. Chapman, deceased, against the city council of Charleston and the children of Robert B. Chapman and James Chapman, both deceased. The Circuit decree, omitting its statement of facts, was as follows:

The plaintiffs contend that the city is liable to them and defendants, who are children of predeceased sons of testator, for the stock transferred to George W. Williams & Co., as aforesaid, with interest from March 6, 1887, alleging that the four qualified executors had not the power to assign the stock, and if they had, no one nor two of them had. At common law, executors had such power, and it is not abridged as to choses in action by the act of 1824. 2 *Wms. Ex'ors*, 806, and note 1, 1177; *Rhame* v. *Lewis*, 13 Rich. Eq., 269; *Reynolds* v. *Rees*, 23 S. C., 446. And it may be exercised by one of several executors. 2 *Wms. Ex'ors*, 810, and note 1; *Rosborough* v. *McAliley*, 10 S. C., 235. Stock is a chose in action, and could be assigned only by a personal representative. The order of the ordinary in 1866 could add nothing to this power, and would have been useful only as a circumstance in a doubtful case, to show good faith. *Roberts* v. *Johns*, 16 S. C., 183.

The city had the right, in the absence of circumstances tending

to show the contrary, to assume that the executor or executors were acting in good faith. Such circumstances are not proven in this case. The city was not a party nor privy to the case of *Caldwell, ex'or*, v. *Chapman*, introduced in evidence in this action, and no notice thereof has been proven to have been had by the city, and it is unaffected by any proceedings or .investments thereunder. There is not even a suggestion that the city colluded with the executors in these transfers, or made any profit thereby.

Plaintiffs further contend, that if the power existed ordinarily, as above found, yet the terms of this will, as to this particular stock, took the power of sale from the executors, and if it does, then the plaintiffs must prevail, for the city was bound to know the contents of the will, from which the executors derived their authority. The will expressly gives the power, except as to such public securities as he has directed should constitute the sum of twenty-five thousand dollars, to each of testator's daughters, and his dwelling and the accompanying tangible personal property to be held for a home for his wife and children.

It is first contended, that testator had directed that this stock should constitute the $25,000 for each of his daughters, and that thereby the power to sell it was taken from the executors, not only while each daughter had the personal expectation of receiving and enjoying it through trustees, as provided in the will, but also after their estate therein had ceased; and, secondly, that the power was taken from the executors because this stock was set apart for the benefit of the widow. Testator's will does not designate any particular stock to be taken for his daughters. One died in his life-time. The will, in all of its provisions, is as to her as if it had never been written. At his death, the will spoke and meant that, for testator's two daughters then living, $25,000 each, or $50,000, should be taken from $73,710 of the city and State stock, left by testator at a fixed future time, without designating any particular certificates thereof which were to be taken.

Who can say that this $20,000 of city stock was to be taken for the two daughters? If we were able to say, from the will and the surrounding circumstances, that testator so intended, and that the stock still retains that impress, then, upon the death of the

daughters during minority and unmarried, it became divisible among testator's sons absolutely, without limitation to their lives or solvency; and only a son, or his *personal* representative, could sue therefor, or for any breach of contract in regard thereto. In such a case, the statute of limitations would be applicable.

But it never was, and never could properly have been, so taken. The executors were to manage the estate, except the house and tangible personal property which went with it, and pay to the widow so much of the income as might be necessary to support the family, even if it required the whole; but if there should be a surplus, as testator evidently expected, the executors were to invest that in safe public securities, which, along with the $73,-710, was to be used in providing for testator's widow and daughters; and whatever impress may have originally been given to the $20,000, no unsalable quality could continue to exist after the death of testator's two daughters during their minority and unmarried, for then the $20,000 fell into the residue, and exception, which may have been created, was for their benefit, and then ceased. The will did not designate nor suggest even the kind of safe public securities which were to be set apart, and the income paid to the widow, and afforded no suggestion calculated to put the city upon the inquiry as to the manner in which the executors were holding this stock.

The executors' breach of trust, without notice of it to the city, would not affect it. "Shall be first taken out of my estate," as used in the will, can mean no more than that this $30,000 was to be set apart so as not to enter into the division of which testator was then speaking; but they did not deprive the executors of the right to control, and, if circumstances demanded, to sell it, for the will required them to collect and pay the interest to the widow, and at her death divide the *corpus.*

It is said, finally, that the executors had been discharged by an order in the case of Caldwell, executors, *v.* Chapman, above referred to. The order was, that they be discharged upon complying with certain conditions, which were never complied with, and, besides, if such judgment had been pronounced, it would have been beyond the jurisdiction of the court therein.

It is ordered and adjudged, that the complaint herein be dismissed.

Plaintiffs and the infant defendants appealed on the following grounds: 1. Because his honor erred in dismissing the complaint herein. 2. Because his honor erred in holding that the city stock involved in this case could be transferred by one of the executors of James Chapman. 3. Because his honor erred in holding that the stock of the city of Charleston, standing in the name of the testator at the time of his death, constituted "a chose in action," and that the power of the executor to sell the same, was not affected by the act of 1824; whereas, it is respectfully submitted, his honor should have held that the said stock constituted "personal chattels or visible effects of said testator," a valid sale of which could not be made without the previous order of the Court of Equity or Ordinary. 4. Because his honor erred in holding that the city council had no notice of the proceedings and decree in Caldwell *v.* Chapman, allotting the said city stock to Isabella Chapman. 5. Because his honor erred in holding that the power of sale of the executors of James Chapman extended to the said city stock. 6. Because his honor erred in holding that the executors' breach of trust did not affect the city, and render the transfer void. 7. Because his honor erred in holding that the discharge of the executors in Caldwell *v.* Chapman was not within the jurisdiction of the court therein. 8. Because his honor erred in holding that the city is not liable to the plaintiff for the said city stock.

*Messrs. Lord & Hyde* and *Langdon Cheves*, for appellants.

*Mr. Charles Inglesby*, contra.

April 6, 1889. The opinion of the court was delivered by

MR. JUSTICE McIVER. On the 31st of January, 1859, James Chapman departed this life, having first duly made and executed his last will and testament, with a codicil thereto, the one bearing date the 27th of May and the other 5th of July, 1856. By his will, the testator appointed his three sons, Thomas E., James,

and Robert B., executors, and his wife, Isabella, executrix, and by the codicil he appointed two additional executors, John W. Caldwell and James H. Wilson. The will was admitted to probate on the 7th of February, 1859, and on that day Robert B. Chapman, John W. Caldwell, and James H. Wilson qualified as executors, and on the 4th of February, 1860, James Chapman also qualified. The other two persons named for the purpose never qualified, though the records do not show that they ever formally renounced the executorship. The several clauses of the will, as set out in the "Case," are not numbered, but for convenience of reference we have numbered them in regular order.

By the third clause, the testator gives to each of his three daughters, naming them, the sum of twenty-five thousand dollars, saying: "This bequest to each of my said daughters, I do not intend shall, in anywise, abate or contribute, in case of any deficiency of my estate, but shall be held as a provision made for my·said daughters, and to be preferred over all others." But he goes on to provide, that if, from any unforeseen contingency, the balance of his estate should not yield a sufficient income to afford an adequate support for his widow, then the annual income from each of the sums given to the daughters shall be charged with a contribution in equal portions with so much as may be necessary to make up a sum sufficient for the proper maintenance of his widow during her life or widowhood. He then directs "that the said sum of twenty-five thousand dollars shall be taken in the most secure investments I have, such as stocks or bonds of the city of Charleston, or stocks of the State of South Carolina"; and further provides, that the sums thus given to the daughters, as well as any other portion of his estate to which they become entitled on the final division of his estate, "shall be taken and held by trustees hereinafter to be named, and in the manner hereinafter to be provided."

In the fifth clause, the testator directs that the whole of his estate shall be kept together by the executors until the youngest daughter shall attain the age of 21 years, unless all of the daughters shall marry before that period. "And then and in that event, I desire, and so devise, that my estate be divided in the following manner: First, that from it shall be taken, as is here-

inbefore directed, for each of my said daughthers, the sum of
$25,000, in the manner hereinbefore directed, which shall be
transferred to trustees, for my said daughters, hereinafter named,
and which shall be held by the said trustees subject to the follow-
ing uses, trusts, and purposes"—going on to declare the same,
providing that in case any of his daughters should die, leaving
no issue, "then, and in such case, the share or portion of my
estate to such daughter or daughters, given under this my last
will and testament, shall cease and determine, and the same and
every part thereof shall be divided among my other children,
share and share alike."

In the eleventh clause, the trustees of the daughters are named,
and in the twelfth, after naming the executors, the testator says:
"And I give them power to sell and dispose of such parts of my
estate as they may think expedient, except such public securities
as I have directed should constitute the sum of twenty-five thou-
sand dollars for each of my said daughters, and my dwelling house,
with the furniture, plate, servants, and other appurtenances of
the same."

In the fourth clause, the testator makes provision for his wife
during her life or widowhood, giving her, amongst other things,
so much of the income of his estate as may be necessary to main-
tain her and such of his children as may require it, in the style
to which they were accustomed during testator's life-time, and
directs that any surplus of such income shall be invested annually
by the executors in approved public securities, "which shall be
considered as part of my estate in the division of the same, which
I hereafter direct."

In the sixth clause, the testator provides for his widow in case
a final division of his estate shall become necessary, by reason of
the marriage of all the daughters, or from any other unforeseen
cause, before the youngest daughter shall attain the age of 21
years, and his wife shall then be alive and continue a widow, by
which, after giving his dwelling house and certain other property
to his wife for life or during widowhood, he directs his executors,
in making the division of the estate, to "set apart the sum of
thirty thousand dollars in secure public investments," the annual
income from which shall be paid to the wife during her life or

widowhood, and upon her death or marriage, this provision, as well as every other made for the wife, "shall thereupon cease and determine, and the same and every part thereof shall be immediately thereupon divisible among my children in equal parts or shares," to be held by them on the terms prescribed, which it is not important to state.

The seventh clause makes provision for testator's sons, the particulars of which we do not deem it necessary, for the purposes of this inquiry, to state, further than to say that the plaintiffs claim that under the limitation found in this clause they succeeded to the share of their father. The eighth and ninth clauses of the will need not be specially noticed further than to say that they both show that no division of the estate was intended until the youngest daughter married or attained the age of 21 years. So, also, as to the tenth clause, there is nothing in it which can affect the present controversy. The same remark is applicable to the first and second clauses.

The testator left surviving him his widow, two daughters, and three sons, the other daughter having died during his life-time, leaving no issue. Both of the surviving daughters died in 1864, leaving no issue. Thomas E. Chapman, one of testator's sons, died in 1868, leaving two children, who are the plaintiffs in this action; Robert B. Chapman, another son, died in 1868, leaving two daughters, who are defendants herein; and the third son, James Chapman, jr., died in 1881, leaving five children, who are likewise defendants herein; and finally, the widow of the testator died 6th March, 1887.

It appears from the inventory of testator's estate, that the only public securities held by him at the time of his death were fifty thousand dollars of city of Charleston stock, represented by various certificates bearing different numbers, and twenty-three thousand seven hundred and ten dollars of State stock. The books of the city treasurer, which were offered in evidence, show that all of the city stock has been transferred at different times to different persons, all of these transfers having been made by Robert B. Chapman, executor, except one, where the original certificate having been lost, it is not known who signed that transfer. These books show that two of the certificates, No. 169 and No. 170, for

$10,000 each, were, on the 2d of August, 1866, transferred by Robert B. Chapman to the estate of James Chapman, and a new certificate, No. 3,005, in the name of that estate, issued for the sum of twenty thousand dollars. The stock represented by this last mentioned certificate was transferred as follows: One-half by Robert B. Chapman and James Chapman, executors, to George W. Williams & Co., on the 5th of July, 1867, and the other half by James Chapman, executor, to George W. Williams & Co., on the 12th of August, 1867.

The plaintiffs claim that the stock represented by certificate No. 3,005 had been set apart to testator's widow by the executors under certain proceedings set out in the record; and that upon her death, they, as the children of one of testator's deceased sons, Thomas E. Chapman, together with the children of the other two deceased sons, Robert B. Chapman and James Chapman, became entitled to said stock, in the proportions stated in the complaint; that the transfers of said stock, made by Robert B. Chapman and James Chapman, executors, to George W. Williams & Co., "were illegal and void, and were made through the carelessness of the officers and agents of the city, and by reason thereof the said stock has been wholly lost to the plaintiffs and the other parties entitled thereto." They, therefore, bring this action, to require the city of Charleston to deliver the city stock thus illegally transferred to the plaintiffs and the other parties entitled thereto, or account to them for the same; and as the children of Robert B. Chapman and the children of James Chapman declined to unite in this action as plaintiffs, they have been made defendants.

It is alleged in the complaint, and the fact is so, that on the 25th of May, 1866, a bill was filed in the Court of Equity by J. W. Caldwell, Robert B. Chapman, and James H. Wilson, as executors of James Chapman, against Thomas E. Chapman, James Chapman, and such of the children of the three sons as were then *in esse,* who were supposed to be remaindermen under the will, for the settlement of the estate of the testator, in which the executors stated that they were ready to account and to set apart the widow's share, but were unwilling to turn over the shares of the testator's sons to them, as they were advised that they were only entitled to a life estate with remainder to their children, and that

it was the duty of the executors to hold these shares for the benefit of those who would become entitled thereto upon the happening of the contingencies mentioned in the will.

The chancellor, holding that the period for distribution had arrived, adjudged that the sons were entitled to have possession of their shares, whether their estate were absolute or for life only, and referred it to Master Tupper, to inquire and report a scheme for the settlement of the estate. On the 12th of July, 1886, Master Tupper filed his report, setting forth in detail what property had been allotted to the widow and the three sons respectively by the executors, in which he recommended that such allotment be confirmed, and "that upon the delivery to the widow and sons of the real and personal property assigned to them respectively, the executors be discharged"; and this report was confirmed, by consent, by an order of Chancellor Carroll. The allotment to the widow embraced, among other things, $20,000 of city stock, as to which Master Sass, to whom the issue in the present action was referred, found, as a matter of fact, that certificate No. 3,005, above referred to, represented the stock then allotted to the widow, though it does not appear that such stock was ever transferred to the widow, but, on the contrary, it remained on the books in the name of the estate of James Chapman until it was transferred to George W. Williams & Co., as above stated.

When the record of these proceedings in the late Court of Equity was offered in evidence, the city council objected upon the ground that, they not being parties thereto, it was *res inter alios acta*, and in the absence of any evidence that they had notice of such proceedings, such record was incompetent evidence against them. The master overruled the objection, and the city council excepted. For the reasons stated in his report, which is set forth in the "Case," the master found that the transfers of stock by the executors to George W. Williams & Co., above referred to, were made without authority, and that the city council of Charleston was responsible for the damages resulting to the plaintiffs therefrom. To the report the city council filed exceptions, and the case was heard by his honor, Judge Norton, upon report and exceptions, who rendered judgment sustaining the

exceptions, overruling the report, and dismissing the complaint. From this judgment the plaintiffs, as well as all the defendants except the city council of Charleston, appeal upon the several grounds set out in the record.

The fundamental inquiry in the case is, whether the executors, all or some of them, had the power to transfer the stock in question. There can be no doubt that at common law an executor had an absolute power of disposal of the whole personal property of his testator: 2 *Williams on Executors*, 670 (2nd edit.); and while it is true that this absolute power has been restricted by the act of 1824, now incorporated as section 1976 of General Statutes, requiring that he shall first obtain an order of sale from the proper tribunal, unless such sale is directed by the will, it has been settled in this State by the case of *Rhame* v. *Lewis* (13 Rich. Eq., 299), recognized and followed in *Reynolds* v. *Rees* (23 S. C., 448), that such restriction does not apply to the power of an executor to transfer choses in action. So that if this stock is a chose in action, there can be no doubt of the power of the executors to transfer it, unless forbidden by the terms of the will to do so.

It seems to us that this stock must be regarded as a chose in action. It is nothing more than an acknowledgment that the city council of Charleston is due to the person named in the certificate or his assigns the sum of money specified therein, which is payable at the time therein stated, with interest, at the rate specified, payable at certain stated times, with a stipulation that the same is transferable only at the office of the city treasurer. It is a mere promise to pay a certain sum of money at a time stated, with interest thereon, at a specified rate, payable at certain stated periods. Such a paper, signed by an individual, would unquestionably constitute a chose in action, and the fact that this paper is executed by a corporation cannot have the effect of altering its nature and legal effect. It follows, then, that no order of sale was necessary to render these transfers valid.

Inasmuch as the right to transfer this stock does not rest alone upon the power of sale conferred by the will, but might have been lawfully exercised under the common law powers of the executors, it is scarcely necessary to consider the point raised in the

argument that the power was defectively executed, because all of the executors did not unite in exercising it; for according to our construction of the clause conferring the power it was given to the executors as such; and when that is the case, it is too well settled to admit of question that the power may be exercised by any one or more of several executors, at least so far as personal property is concerned, upon the principle stated in 2 *Williams on Executors*, 683 (2nd edit.), as follows: "Co-executors, however numerous, are regarded in law as an individual person; and by consequence the acts of any one of them in respect of the administration of the effects, are deemed to be the acts of all;" quoted with approval in *Rosborough* v. *McAliley*, 10 S. C., 246.

Our next inquiry is, whether there is anything in the will forbidding the exercise of this power of sale. So far from there being any general prohibition in the will as to the exercise of this power of sale, the testator has, on the contrary, expressly invested his executors with power to sell any part of his estate, except certain specified portions thereof. His language is: "I give them power to sell and dispose of such parts of my estate as they may think expedient, except such public securities as I have directed should constitue the sum of twenty-five thousand dollars for each of my said daughters, and my dwelling house," &c., which he intended as a home for his wife and children.

It will be observed that the testator does not specify any particular public securities as excepted from the power of sale, but he only refers to them in general terms as such public securities as he had directed should constitute the sum of money intended for each of his daughters. The legacies to the daughters are not specific legacies, and they can scarcely be regarded even as demonstrative legacies, for no particular fund is designated out of which they were to be paid, as in *Boykin* v. *Boykin* (21 S. C., 532); but the direction is simply that these sums of money intended for the daughters "shall be taken in the most secure investments I have, such as stocks or bonds of the city of Charleston, or stocks of the State of South Carolina," but no particular stocks or bonds are designated as the fund out of which they were to be paid. It is clear, therefore, that they might have been paid in

United States bonds, or any other public securities, such as city or State stocks.

It does not appear what amount of public securities the testator owned at the time he executed his will, though it does appear that at the time of his death he owned city and State stocks to the amount of $73,710, a sum insufficient to make the provision intended for the three daughters. The testator must, therefore, have expected when he signed his will to acquire additional public securities before he died, or intended that his executors should do so after his death; but the death of one of his daughters during his life-time rendered this unnecessary, as the amount of public securities on hand at the time of his death was much more than sufficient to make the required provision for the two surviving daughters.

It will be observed that by the fifth clause of the will the testator directs that the whole of his estate should be kept together until his youngest daughter married or attained the age of 21 years, "and then and in that event" the estate was to be divided in the manner prescribed: "First, that from it shall be taken the sum of twenty-five thousand dollars in the manner hereinbefore directed"—that is, in public securities—"which shall be transferred to trustees;" &c., and the same clause goes on to provide that upon the death of any daughter without issue, the share of such daughter under the will "shall cease and determine, and the same and every part thereof shall be divided among my other children, share and share alike." So that it is quite clear that until the period fixed for a division arrived, the portions intended for the daughters could not be taken out of the estate and transferred to their trustees; and as all the daughters died without issue before that period arrived, it never did become necessary or even permissible to separate their portions from the rest of the estate, and hence, in the events which have happened, no portion of the estate was excepted from the power of sale conferred upon the executors, except the dwelling house and other specific articles given to the widow.

The whole tenor of the will shows that the testator did not intend to except public securities from the power of sale conferred upon the executors, because he regarded them as the safest of all

investments that could be made; for if that had been his inten-tion, it would have been very easy to say so. The most natural way to have expressed such intention would have been to say that the executors are authorized to sell any portion of my estate, as they may think expedient, except such public securities as I may own at the time of my death. But instead of saying this, instead of excepting all of his public securities, he only excepts those which he desired should constitute the portions of his daughters, when the time arrived for setting apart such portions and placing them in the hands of trustees for their benefit; and as that time never arrived, and as this provision, according to our view, was manifestly intended for the personal benefit of the daughters, we do not think that, in the events which have occurred, any por-tion of the estate was excepted from the power of sale, except the dwelling house, &c.

It is significant, in this connection, to notice that the thirty thousand dollars in public securities, which, in the sixth clause of the will the testator directs, in a certain contingency, shall be set apart for the widow, are not excepted from the power of sale conferred upon the executors, but only such public securities as he directed should be set apart or taken out of his estate for his daughters and placed in the hands of trustees when the period for division should arise.

But in any view of the case, it was incumbent on the plain-tiffs to show that this particular stock represented by certificate No. 3,005, the alleged illegal transfer of which constitutes the basis of their claim, was excepted from the power of sale, and this they have failed to do. There is no doubt that, as this stock originally stood on the books of the city treasurer in the name of the testator, and was afterwards consolidated into one cer-tificate in the name of his estate, the city authorities must be presumed to have examined the will before they could pro-perly allow the stock to be transferred; and if they failed to make such examination, they must be presumed to have had notice of everything that such an examination properly con-ducted would have disclosed. Now, if they had made such ex-amination, they would have learned that the executors had full power to dispose of any public securities except such as were

necessary to meet the provision intended for the daughters, and as they would also have learned that one of the daughters had predeceased the testator, leaving only two to be provided for, and that the amount of public securities owned by the testator at the time of his death was much more than sufficient to provide for these two, and as they would have learned further that these two daughters had died without issue long before the period arrived when the public securities were to be taken out of the estate and placed in the hands of their trustees, it seems to us that the result of their inquiries would have shown that the executors had full power not only to dispose of this particular stock, but also any or all of the public securities.

It is, however, contended that when, under the proceedings in the Court of Equity above referred to, the stock in question was allotted to the widow in the division then made under the supervision of the court, the power of sale was determined, and any subsequent transfer by the executors was wholly without authority. While that may be so as to the parties to that case or their privies, and would be so as to the city council if they had had notice of such proceedings, yet as they were neither parties nor privies to that case, and had no notice of it, we do not see how they can be affected by anything that was done under that case. There was nothing in the will to indicate that there was any likelihood or expectation of an appeal to the courts for any purpose. On the contrary, the whole tenor of the will, especially the provisions of the tenth clause, indicated that the testator did not intend or expect that any resort should be had to the courts for the purpose of carrying out the provisions of his will

Hence, while the city authorities must be presumed to have had knowledge of the contents of the will, such knowledge, instead of inducing them to inquire whether there were any proceedings in the courts in reference to the estate, would have had rather the contrary effect. The parties to that case took no steps to inform the city council of what had been done, or to transfer the stock to the widow, or to any one for her, but it was suffered to remain on the books of the city treasurer in the name of the estate of the testator, apparently subject to the control and disposition of his executors, and there was nothing whatever done,

so far as we can perceive, calculated to excite even a suspicion in the minds of the city authorities that the executors no longer had power to dispose of the stock.

The position taken in the argument that under the proceedings in equity the executors were discharged with their own consent, and therefore had no power to transfer the stock, is fully disposed of by what is said by the Circuit Judge: first, that under the order the executors were to be discharged upon certain conditions, which were never complied with; second, that the court had no authority to discharge them. *Campbell* v. *Bank of Charleston*, 3 S. C., 384.

The judgment of this court is, that the judgment of the Circuit Court be affirmed.